UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:13-CR-194-SEB-TAB |
| ) | |
| BRIAN CARMICHAEL, ) | |
| ) | |
| Defendant. ) | |

FILED
JAN 21 2013
U.S. DISTRICT COURT
INDIANAPOLIS, INDIANA

## Factual Basis for Guilty Plea

The United States of America, by counsel, Joseph H. Hogsett, United States Attorney for the Southern District of Indiana, Steven D. DeBrota, Senior Litigation Counsel Southern District of Indiana, Thomas T. Ballantine, Senior Counsel Environmental Crimes Section U.S. Department of Justice, Jake Schmidt, Special Assistant United States Attorney for the Southern District of Indiana, and the Defendant, Brian Carmichael, in person and by counsel, James J. Bell and John McCauley, hereby submit the following factual basis to support the guilty plea in the instant case.

The parties stipulate and agree that the United States could prove the following facts to a jury beyond a reasonable doubt if the case went to trial. However, because this pleading was prepared for the change of plea phase of this case only, the parties reserve the right to present additional evidence at the time of sentencing. This pleading is not intended to foreclose the

presentation of such evidence nor does it present the entirety of the parties' current knowledge of the underlying facts.

1. The Defendant, Brian Carmichael, (Carmichael), is charged with conspiring to violate federal law and defraud the United States, in violation of 18 U.S.C. § 371.

2. The Energy Independence and Security Act of 2007 required the U.S. Environmental Protection Agency (EPA) and the U.S. Internal Revenue Service (IRS) to encourage the production and use of renewable fuel in the United States. Specifically, this Act directs these agencies to write regulations and administer tax credits to ensure an increase in the use of such fuel through a taxpayer-funded incentive program and a mandate that is applied to petroleum refiners and importers.

3. Since May 2007, petroleum refiners and importers, known as "obligated parties," have been required by federal law to have renewable fuel in their product mixes. Obligated parties can meet this requirement by purchasing credits from renewable fuel producers. These credits are called "renewable identification numbers" or "RINs."

4. E-Biofuels, LLC (E-Biofuels), was a renewable fuel producer in Middletown, Indiana, It was founded in 2006. Sometime after it was founded, Carmichael bought into the company and owned slightly less than one-third of it. He served as an officer of the company and as its principal salesman. He sold his interest in May of 2010, but continued to market E-Biofuels product through his own company. E-Biofuels operated a production plant which

processed animal fats and vegetable oils (feedstock) into a renewable fuel. This was accomplished through a process of mixing feedstock with alcohol and a catalyst in a heated system of tanks and pipes. The process caused chemical reactions within the mixture, and the resulting product was biodiesel, also known as "B100."

5. Renewable fuel producers can generate RINs by producing qualifying renewable fuels, including biodiesel, in compliance with EPA regulations. Then, the producers can sell the RINs to obligated parties or middlemen, usually by selling a volume of biodiesel with a number of RINs "assigned" to that volume. It is illegal to generate RINs for a volume of biodiesel that is not actually produced in compliance with EPA regulations, and it is illegal to generate RINs more than once for any given volume of biodiesel.

6. Under EPA's regulations, there are circumstances that allow a RIN owner to separate RINs from the volume of biodiesel to which they had been assigned. After separation, RINs could be bought and sold without buying and selling the associated fuel. From then on, this "RIN-stripped" biodiesel could never be used to generate more RINs.

7. In 2009, retroactively in 2010, and in 2011, blenders could apply for fully refundable biodiesel mixture tax credits if they blended B100 with petroleum-based diesel, and then sold the resulting mixture for use as a fuel. If blenders complied with IRS rules and submitted appropriate "Certificates for Biodiesel," they could receive a one dollar per gallon tax credit, paid by the U.S. Department of Treasury. Thus, some biodiesel buyers were willing to pay a

premium for B100, because they could earn the one dollar per gallon credit by blending it with petroleum diesel.

8. Under IRS rules, blenders qualified for the blender's tax credit by mixing a very small amount of petroleum diesel with B100. The resulting product of this minimal blending is known as "B99.9" or "B99," which means that it is 99.9% biodiesel and 0.1 % petroleum diesel. It is illegal to claim a blender's tax credit for biodiesel unless the fuel is actually produced, blended, and sold in compliance with IRS rules. In particular, it is illegal to claim the credit without a true and accurate Certificate for Biodiesel, and it is illegal to claim the credit more than once for any given volume of biodiesel.

9. Because of the value of RINs and the blender's tax credit, one gallon of B100 with assigned RINs and an available tax credit is worth much more than one gallon of RIN-stripped B99. E-Biofuels almost always issued Certificates for Biodiesel to its customers when they purchased biodiesel.

10. Carmichael was a co-owner and director of sales at E-Biofuels. He operated the company with Craig Ducey, Chad Ducey, and Chris Ducey. Even though the facility was designed to produce biodiesel from animal fats and vegetable oils, during the period when Carmichael was employed, it predominantly bought and sold biodiesel that had been manufactured by others.

11. Specifically, during this time, E-Biofuels purchased biodiesel from other companies, and then sold it as its own product. This was very profitable, because Carmichael, his co-conspirators, and E-Biofuels purchased a type of

4

product that was not eligible for a tax credit or marketable environmental credit and sold it to customers as if it was eligible for those credits. To do so, Carmichael, his co-conspirators, and E-Biofuels used various means to deceive its customers.

12.  Carmichael and the Duceys worked in concert with others, including Joseph Furando and Evelyn Katirina Tracy Pattison (Tracy). Furando owned and operated Caravan Trading Company, LLC, (Caravan) and CIMA Green, LLC, (CIMA). These businesses, which were located in New Jersey, engaged in the selling and trading of fuel and other products. Tracy was the director of Caravan and the chief operating officer of CIMA.

13.  Carmichael's involvement in the scheme included the following conduct:

14.  As documented in e-mails and other records, around July 2009, Craig Ducey caused Certificates for Biodiesel to be issued for biodiesel that had not been produced by E-Biofuels. These certificates made it possible for E-Biofuels to collect the tax credit for that biodiesel. Carmichael and others at the company knew of this practice and knew it was used to address cash flow problems at the company.

15.  For example, on December 11, 2009, Craig Ducey sent an email to Carmichael, Chad Ducey, and a bookkeeper, directing them to project the amount of money needed to meet the company's cash flow needs in the short-to-medium term. Craig Ducey then directed them to fraudulently file tax credits for biodiesel that had not been produced, blended, and sold in compliance with

IRS rules. Later, Carmichael participated in meetings with co-conspirators regarding "how to treat the IRS liability," meaning the fraudulently taken tax credits. The co-conspirators then hid what they had done by omitting information when they filed tax returns for E-Biofuels, which involved misleading and lying to the company's tax accountants. This activity may be proven through emails, other records, and witness statements.

16. Sometime in December 2009 or January 2010, Carmichael spoke with Furando, and Furando offered to sell E-Biofuels "flex feedstock," which was biodiesel that had previously been assigned a RIN and the tax credit had already claimed. Furando explained that he had another customer that bought flex feedstock, claimed to have produced it, and then sold it as new 100 percent biodiesel (B100). Carmichael, as the primary salesman, knew the term flex feedstock was bogus; however, he still negotiated deals for RIN-stripped B99 with Furando and/or Furando's employees. Carmichael admits that this conversation took place. It is corroborated by statements Furando made about it, which were witnessed by others, and which were made in furtherance of the conspiracy.

17. Beginning in approximately February 2010, E-Biofuels began taking routine delivery of RIN-stripped B99 from Caravan and CIMA and fraudulently re-selling that fuel to its customers, usually by representing that it was B100 with assigned RINs. Although he was mostly involved in sales, Carmichael knew of various logistical tricks that were used to make it appear as if the product Furando sold E-Biofuels had actually been produced at E-

Biofuels's facilities. For example, he knew that E-Biofuels routinely produced false bills of lading claiming that the production was B100, fraudulently generated and assigned new RINs to the biodiesel, and fraudulently produced paperwork that allowed its customers to claim the tax credit.

18.  The government's investigation uncovered extensive documentation of the logistics of the above scheme including, for instance, multiple sets of documents (all traceable to single truck loads of biodiesel) that: (1) accurately describe the truck load as B99 (with no RINs), (2) falsely describe it as feedstock, and (3) falsely describe it as B100 with assigned RINs, depending on the needs of the conspirators with respect to the truck load. Truck drivers and other E-Biofuels workers were also witnesses to the fraudulent activity and can testify to facets of it.

19.  This scheme added more than $55,000,000 in fraudulent value to approximately 35,000,000 gallons of biodiesel.

20.  On May 24, 2010, Imperial Petroleum Inc. (Imperial) purchased E-Biofuels. Imperial was a publicly traded company with few assets other than E-Biofuels. Following the sale, E-Biofuels generated more than 97% of Imperial's total operating income. Carmichael, Craig Ducey, and Chad Ducey each received Imperial stock and a promissory note in exchange for their ownership of E-Biofuels. After this transaction, Craig Ducey, Chad Ducey and Chris Ducey continued to serve as paid officers, managers, or consultants for E-Biofuels and their method of operation remained the same. In addition, Carmichael continued to sell biodiesel from E-Biofuels through a company he

had formed in March 2010, and he received a commission on all E-Biofuels sales. Between the fall of 2010 and the fall of 2011, Carmichael was paid 1.5 cents for every gallon of biodiesel E-Biofuels sold.

21. Jeffrey Wilson was the president and CEO of Imperial during this time. He was initially unaware of the misrepresentation surrounding the biodiesel sold by E-Biofuels; however, once he learned that the facility was not producing biodiesel from raw feedstock, he allowed that to continue and published various statements claiming that E-Biofuels was, in fact, manufacturing biodiesel from raw feedstock.

22. After Imperial purchased E-Biofuels, the highest price paid for Imperial stock was $1.85 per share. On April 4, 2012, E-Biofuels filed for bankruptcy, and the value of Imperial stock declined. On November 13, 2013, Imperial stock was traded at approximately three cents per share.
The government's investigation of this case began in the fall of 2011. The government can prove the allegations against Carmichael and his co-conspirators through the documents mentioned above, through witness testimony—including testimony by lower-level unindicted co-conspirators and third-party witnesses, through analysis of business records of those who sold B99 to the conspirators and those who purchased B100, and through recordings made by conspirators of conversations in furtherance of the conspiracy.

/

/

Respectfully submitted,

JOSEPH H. HOGSETT
UNITED STATES ATTORNEY

1/21/14
Date

_____
Steven D. DeBrota
Senior Litigation Counsel

1/21/14
Date

_____ Fer
Thomas Ballantine
Senior Counsel
U.S. Department of Justice

1/21/14
Date

_____ Fer
Jake Schmidt
Special Assistant U.S. Attorney

1/21/14
Date

_____
Brian Carmichael
Defendant

1/21/14
Date

_____
James Bell
Attorney for Defendant

1/21/14
Date

_____
John McCauley
Attorney for Defendant

9